UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS DIVISION

|  |  |
|---|---|
| DIANE YOUNG, *as parent and guardian of Q.Y., a minor,*<br><br>                              Plaintiff,<br><br>v.<br><br>BOSTON CHILDREN'S HEALTH PHYSICIANS, LLP,<br><br>                              Defendant. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

DIANE YOUNG, as parent and guardian of Q.Y., a minor, ("Plaintiff") on behalf of themselves and all others similarly situated, bring this action against Boston Children's Health Physicians, LLP ("BCHP" or "Defendant"). The following allegations are based on Plaintiff's knowledge, investigations by counsel, facts of public record, and information and belief.

**NATURE OF THE ACTION**

1.      This class action arises out of a recent cyberattack and data breach (the "Data Breach") resulting from BCHP's failure to implement reasonable and industry-standard data security practices to protect its patients' personal identifying information, including personal health information ("PII/PHI").

2.      BCHP is a large, multi-specialty healthcare provider focusing on pediatric patients located primarily in New York and Connecticut. It advertises over 300 clinicians staffing over 60 regional offices and 25 specialty areas of medical expertise. BCHP is affiliated with the only level 1 pediatric trauma hospital in the region, and for complex cases, is affiliated with Boston Children's Hospital. In providing medical care to children and families, BCHP collects, uses, and derives a benefit from its patients' extremely sensitive PII/PHI—and it assumes a significant duty

1

to protect that information.

3.      But BCHP did not protect its patients' PII/PHI.

4.      In September of this year, in a shocking cyberattack, thieves accessed, and reportedly exfiltrated, files including information about current and former patients, employees, and guarantors. The Data Breach resulted in the exposure and theft of, at a minimum, patients' names, Social Security numbers, addresses, dates of birth, driver's license numbers, medical record numbers, health insurance information, billing information, and treatment information.

5.      A criminal ransomware group, BianLian, took responsibility for the attack and claimed that it had added information from BCHP to its dark web data leak site. BianLian is a threat group that has been active since at least 2022, and actively targets critical infrastructure entities, including healthcare providers.

6.      Even when BCHP notified Plaintiff and the Class Members of the Data Breach, it failed to adequately describe the Data Breach and its effects, as well as the measures it took to prevent future data breaches.

7.      In its notice to patients, BCHP admitted that an IT vendor had informed it of "unusual activity in its systems," and that a third party had gained access to its network and taken files. BCHP did not explain how it could have allowed PII/PHI including medical information and social security numbers to be so easily accessed. And while it promised it had "implemented additional safeguards to further protect and monitor our systems" those vague statements do not confirm that Plaintiff's or the Class Members' PII/PHI will be safe in the future.

8.      BCHP failed to protect Plaintiff's and the Class Members' PII/PHI, which hackers targeted because of its value in exploiting and stealing Plaintiff's and the Class Members' identities. Plaintiff and the Class Members now face a risk of boundless financial crimes; the

hackers now have the means to open new financial accounts in their names', take out loans using their identities, use their information to obtain medical services or government benefits, file fraudulent tax returns, obtain false drivers' licenses, and give false information to the police during an arrest—among other things. Plaintiff and the Class Members must now suffer additional financial costs for purchasing protective measures including credit monitoring, credit freezes, credit reports, and other means of detecting and mitigating identity theft.

9.      Plaintiff and the Class Members have suffered, and will continue to suffer, from the loss of the benefit of their bargain, unexpected out-of-pocket expenses, lost or diminished value of their PII/PHI, emotional distress, and the value of their time reasonably incurred to mitigate the fallout of the Data Breach.

10.     Through this action, Plaintiff seeks to hold BCHP accountable and remedy these injuries.

## PARTIES

11.     Plaintiff Diane Young is a resident and citizen of New Rochelle, NY. Her minor child, Q.Y., receives treatment at BCHP. Plaintiff is deeply concerned about the Data Breach, as her minor child's PII/PHI may now be readily available for cybercriminals to sell, buy, or exchange on the Dark Web. Since learning about the Data Breach, Plaintiff has spent several hours researching the incident to determine its extent and gravity. She anticipates spending additional time to mitigate future damages, including reviewing accounts and monitoring financial and health insurance information. Plaintiff and her minor child have a continuing interest in ensuring that Q.Y.'s PII/PHI, which remains in BCHP's possession, is protected and safeguarded from future breaches.

12.     BCHP is a domestic New York limited liability partnership. BCHP is a medical

service provider that markets comprehensive care for newborns, children, and adolescents across New York and Connecticut.

13.    BCHP's registered address is 400 Columbus Avenue, Suite 200E, Valhalla, NY 10595.

## JURISDICTION AND VENUE

14.    This Court has original subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action involving more than 100 putative class members and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Minimal diversity is established because members of the class are citizens of states different than that of Defendant.

15.    This Court has personal jurisdiction over BCHP because BCHP maintains its principal place of business in this District.

16.    Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) because a substantial part of the events giving rise to the claims in this case emanated from activities within this District, and because BCHP maintains its principal place of business in this District.

## FACTUAL ALLEGATIONS

### A.    BCHP collected and kept consumers' PII/PHI.

17.    BCHP is a healthcare provider that specializes in treating newborns, children, and adolescent patients. BCHP advertises that it is the "largest pediatric group in the region, with over 120 primary care pediatricians and over 150 pediatric specialists throughout New York's metropolitan area, the Hudson Valley and Connecticut."

18.    In its business of providing medical services, BCHP collects and stores' patients'

personal information and medical information, including, at a minimum, names, addresses, Social

Security numbers, health insurance information, and medical information. These records were and

are stored on BCHP networks.

**B.    BCHP promised to protect patients' PII/PHI.**

19.    Because of the highly sensitive and personal nature of the information that BCHP

acquires and stores, BCHP knew or reasonably should have known that it stored protected PII/PHI

and must comply with industry standards related to data security, as well as all state and federal

laws protecting consumers' PII/PHI.

20.    In particular, as a pediatric hospital, BCHP knew or should have known that

protecting its minor patients' PII/PHI was of the utmost importance.

21.    BCHP promises its patients that it will protect PII/PHI from theft and misuse and

represented to Plaintiff and the Class Members that it would maintain reasonable security over

Plaintiff's and the Class Members' PII/PHI.

22.    BCHP's website, for example, advertises a Notice of Privacy Practices ("Privacy

Practices") that "describes how medical information about our patients may be used and disclosed

and how they can get access to their individually identifiable health information."[1] The Privacy

Practices describes BCHP's responsibilities under HIPAA[2] and acknowledges that BCHP obtains

patients' PII/PHI. BCHP promises to protect patient data, including the following express

commitments:

   a.    "We are required by law to maintain the confidentiality of health
         information that identifies our patients . . . ."

   b.    "Our practice will obtain your written authorization for uses and disclosures

---

[1] Notice of Privacy Practices, https://bchp.childrenshospital.org/sites/default/files/2024-01/BCHP-Notice-of-Privacy-Practices-English-Rev-10-2023-2.pdf  (last accessed October 22, 2024).
[2] "HIPAA" stands for the Health Insurance Portability and Accountability Act of 1996, which, among other things, sets forth guidelines by which personal information maintained by entities operating in the healthcare and health insurance industries should be protected from fraud and theft.

that are not identified by this notice or permitted by applicable law."

23.    BCHP also promises that it will only share patients' PII/PHI in specific scenarios that are identified in the Privacy Practices, which are largely limited to uses related to the hospital's operations and patient care.

24.    Other than these limited, enumerated scenarios, BCHP promises that it will not release patients' PII/PHI to third parties.

25.    At no time did BCHP inform any Class Member that BCHP did not use reasonable measures to protect PII/PHI from disclosure to third parties; did not use physical, technical, or administrative measures to protect personal information; did not keep patient information confidential; disclosed patient information without patient consent; and did not comply with state and federal laws pertaining to the confidentiality of personal and health-related information.

26.    BCHP also did not obtain Plaintiff's or the Class Members' written authorization to disclose their PII/PHI to unauthorized hackers such as BianLian.

**C.    BCHP has a duty to protect patients' PII/PHI.**

27.    Apart from its own explicit promises, BCHP has a separate duty to protect Plaintiff's and the Class Members' PII/PHI. By obtaining, collecting, receiving, and storing Plaintiff's and the Class Members' PII/PHI, BCHP assumed legal and equitable duties and knew, or should have known, that it was responsible for protecting that PII/PHI from unauthorized disclosure.

28.    This was particularly so given that BCHP patients are primarily children.

29.    BCHP has obligations created by the FTC Act, HIPAA, and industry standards to keep its patients' PII/PHI confidential, to use it only for authorized business and healthcare purposes, and to protect it from unauthorized access and disclosure.

30.    Cyberattacks have become so prevalent that the FBI and U.S. Secret Service have

issued warnings to potential targets, urging them to be aware of and prepared for potential attacks.[3]

31.    BCHP's data security obligations were particularly important given the substantial increase in cyber and ransomware attacks and data breaches in the healthcare industry preceding the date of the Data Breach, as well as given the incredibly sensitive nature of PII/PHI retained in its servers. In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including Change Healthcare (6 TB of sensitive patient data, 2024), Lurie Children's Hospital (792,000 patients, 2024), Consulting Radiologists Ltd. (approx. 500,000 patients, 2024), American Medical Collection Agency (25 million patients, 2019), University of Washington Medicine (974,000 patients, 2018), Florida Orthopedic Institute (640,000 patients, 2020), Wolverine Solutions Group (600,000 patients, 2018), Oregon Department of Human Services (645,000 patients, 2019), Elite Emergency Physicians (550,000 patients, 2020), Magellan Health (365,000 patients, 2020), and BJC Health System (286,876 patients, 2020), BCHP knew or should have known that its electronic records would be targeted by cybercriminals.

32.    BCHP also derives substantial economic benefit from collecting Plaintiff's and the Class Members' PII/PHI. Without the required submission of PII/PHI, BCHP could not deliver its advertised services or obtain compensation from Plaintiff and the Class Members as well as other payers. BCHP knowingly accepted these benefits in exchange for the receipt of Plaintiff's and the Class Members' PII/PHI.

**D.    BCHP allowed hackers to access its systems and seize PII/PHI.**

33.    Plaintiff and the Class Members provided their PII/PHI to BCHP with the

---

[3] Ben Kochman, FBI, Secret Service Warn of Targeted Ransomware, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974.

reasonable expectation and mutual understanding that BCHP would adhere to its promises to keep such information confidential and secure from unauthorized access. Plaintiff and the Class Members relied on BCHP to keep their PII/PHI confidential and securely maintained, to use their information for authorized business and healthcare purposes only, and to make only authorized disclosures of the information.

34.     Plaintiff and the Class Members took reasonable steps to maintain the confidentiality of their PII/PHI, but they relied on BCHP's sophistication and control over its own networks to keep their PII/PHI securely and confidentially maintained.

35.     But despite its express promises to Plaintiff and the Class Members, and its inherent duty to keep their PII/PHI safe, BCHP allowed hackers to breach its systems, access Plaintiff's and the Class Members' PII/PHI, and steal that data for their own, likely nefarious, purposes.

36.     Subsequently, the BianLian ransomware group listed BCHP on its darknet extortion site.

37.     BianLian is a threat group that has been active since at least June 2022.[4] It is known to use double extortion tactics, where sensitive data is exfiltrated and files are encrypted. It often requires payment of a ransom to prevent the stolen data from being listed on its data leak site. According to Guidepoint Security, BianLian is one of the top three threat groups targeting the healthcare sector this year.[5]

38.     The United States Cybersecurity and Infrastructure Security Agency, along with the Federal Bureau of Investigation and Australian Cyber Security Centre, issued a joint

---

[4] Steve Alder, *BianLian Threat Group Claims Responsibility for Cyberattack on Boston Children's Health Physicians*, The HIPAA Journal (Oct. 21, 2024), https://www.hipaajournal.com/bianlian-cyberattack-boston-childrens-health-physicians/.
[5] Steve Alder, *Ransomware Attacks Increased by 9% in Q2, 2024*, The HIPAA Journal (Jul. 25, 2024), https://www.hipaajournal.com/ransomware-attacks-q2-2024/.

Cybersecurity Advisory about BianLian in 2023. The Advisory describes BianLian's tactics and identifies specific mitigation efforts that the agencies recommend small and medium sized organizations implement to avoid being targeted by BianLian.[6]

### E.    BCHP's notice to victims was inadequate.

39.    In October 2024, BCHP began notifying victims of the Data Breach that their confidential PII/PHI had been accessed[7]:

**Cybersecurity Announcement**

Boston Children's Health Physicians ("BCHP") is committed to protecting the confidentiality and security of the information we maintain. Regrettably, this notice is regarding a recent security incident at our IT vendor that involved some of our patients' information.

**What Happened?** On September 6, 2024, our IT vendor informed us that it identified unusual activity in its systems. On September 10, 2024, we detected unauthorized activity on limited parts of the BCHP network and immediately initiated our incident response protocols, including shutting down our systems as a protective measure. We also began an investigation with a third-party forensic firm and determined that an unauthorized third-party gained access to our network on September 10, 2024, and took certain files from our network.

**What Information Was Involved?** The files included current and former employee, patient, and guarantor information. Information varied by individual and may have included names, Social Security numbers, addresses, dates of birth, driver's license numbers, medical record numbers, health insurance information, billing information, and/or limited treatment information. Our electronic medical record systems are on a separate network and were **not** affected by this incident.

**What BCHP Is Doing.** On October 4, 2024, we began mailing letters to individuals whose information was involved. We also established a dedicated, toll-free call center to answer your questions.

To help prevent something like this from happening again, we have implemented additional safeguards to further protect and monitor our systems.

---

[6] Cybersecurity & Infrastructure Security Agency, *#StopRansomware: BianLian Ransomware Group* (May 16, 2023), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-136a.

[7] BCHP, Cybersecurity Announcement, https://bchp.childrenshospital.org/cybersecurityannouncement.

**What You Can Do.** For those individuals whose Social Security number or driver's license number was involved, we are offering complimentary credit monitoring and credit protected services. We recommend that our patients review the statements they receive from their health insurer. If they see services that the patient did not receive, contact the insurer immediately.

**For More Information.** If you believe you are affected but do not receive a letter before October 25, 2024, or if you have questions about this incident, please call 888-401-0395, available Monday through Friday, between 9:00 am and 7:00 pm Eastern Time.

40.     The notice omits crucial information. It does not describe the cause of the Data Breach, the vulnerabilities exploited, or the remedial measures taken to ensure such a breach does not happen again. BCHP has never shared these critical details with Plaintiff or the Class Members.

41.     Accordingly, its "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts about the cause of the Data Breach or any remedial measures. Without these details, Plaintiff's and the Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

42.     BCHP has also done next to nothing to prevent or mitigate further injury to Plaintiff and the Class Members. The notice states that BCHP will offer credit monitoring to individuals whose Social Security or driver's license numbers were involved, but does not offer anything specific to minors and does not offer anything to victims whose PHI was affected.

43.     These measures are woefully inadequate in light of the serious damage to Plaintiff's and the Class Members' privacy, and the present, imminent, and significant risk of identity theft they now face. That risk, which is directly traceable to BCHP's reckless and negligent acts and omissions, will persist and can last a lifetime. Yet BCHP has offered no additional safeguards to shield Plaintiff or the Class Members from the enduring threats now facing them.

44.     Instead, BCHP purports to put the burden of identity protection on Plaintiff and the

Class Members—even though the harm they have suffered is BCHP's fault, not theirs. BCHP's notice warns Plaintiff and the Class Members that they should "review the statements they receive from their health insurer" and contact the insurer "if they see services that the patient did not receive."

45.      BCHP nowhere offers to compensate Plaintiff or the Class Members for time spent on such activities, or reimburse them for money spent on such measures, although BCHP's own acts and omissions led directly to the need for such precautions.

**F.      BCHP broke its promises to Plaintiff and the Class Members and breached its duties to them.**

**i.      Cyberattacks are preventable, but BCHP failed to take appropriate steps to prevent the Data Breach.**

46.      When BCHP allowed the Data Breach to occur, BCHP broke its promises to Plaintiff and the Class Members and breached its duties to protect their PII/PHI and maintain it securely. Despite the prevalence of public announcements of data breach and data security compromises, BCHP failed to take appropriate steps to protect the PII/PHI of Plaintiff and Class Members from being compromised.

47.      BCHP is responsible for allowing the Data Breach to occur because it failed to implement and maintain reasonable safeguards and failed to comply with industry-standard data security practices, as well as state and federal laws governing data security.

48.      BCHP could have prevented or mitigated the effects of the Data Breach by better securing its network, properly encrypting its data, or better selecting its information technology partners—as it promised Plaintiff and the Class Members it would, and as it had a duty to do.

49.      BCHP's negligence in safeguarding Plaintiff's and Class Members' PII/PHI was exacerbated by repeated warnings and alerts directed to protecting and securing sensitive data, as

evidenced by the trending data breach attacks in recent years.

50.     Despite the prevalence of public announcements of data breaches and data security compromises, BCHP failed to take appropriate steps to protect Plaintiff's and the Class Members' PII/PHI from being compromised.

51.     BCHP failed to ensure fair, reasonable, or adequate computer systems and data security practices to safeguard the PII/PHI of Plaintiff and Class Members.

52.     BCHP knowingly disregarded standard information security principles, despite obvious risks, by allowing unmonitored and unrestricted access to unsecured PII/PHI.

53.     BCHP failed to provide adequate supervision and oversight of the PII/PHI with which it was and is entrusted, despite the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather Plaintiff's and the Class Members' PII/PHI, misuse the PII/PHI, and disclose it to others without consent.

54.     BCHP failed to ensure the proper encryption of Plaintiff's and Class Members' PII/PHI and monitor user behavior and activity to identify possible threats.

55.     BCHP failed to ensure the proper implementation of sufficient processes to quickly detect and respond to data breaches, security incidents, or intrusions.

### ii.        BCHP failed to follow FTC guidelines.

56.     According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.[8] To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as BCHP, should employ to protect against the unlawful exfiltration of PII/PHI.

57.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide*

---

[8] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (June 2015), https://bit.ly/3uSoYWF (last accessed April 25, 2024).

*for Business*, which established guidelines for fundamental data security principles and practices for business.[9] The guidelines explain that businesses should:

    a.      protect the personal customer information that they keep;

    b.      properly dispose of personal information that is no longer needed;

    c.      encrypt information stored on computer networks;

    d.      understand their network's vulnerabilities; and

    e.      implement policies to correct security problems.

58.    The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

59.    The FTC recommends that companies not maintain PII/PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[10]

60.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[9] *Protecting Personal Information: A Guide for Business*, Fed. Trade Comm'n (Oct. 2016), https://bit.ly/3u9mzre (last accessed June 25, 2024).
[10] *See Start With Security, A Guide for Business*, Fed. Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited June 25, 2024).

61.    BCHP failure to employ reasonable and appropriate measures to protect against unauthorized access to PII/PHI constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

### iii.    BCHP failed to follow industry standards.

62.    Despite its alleged commitments to securing sensitive data, BCHP does not follow industry standard practices in securing PII/PHI.

63.    Several best practices have been identified that at a minimum should be implemented by providers like BCHP, including but not limited to, educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

64.    Best cybersecurity practices that are standard include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

65.    To prevent and detect cyber-attacks and/or ransomware attacks BCHP could and should have implemented the following measures, as recommended by the United States Government:

   o   Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

   o   Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

o  Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

o  Configure firewalls to block access to known malicious IP addresses.

o  Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

o  Set anti-virus and anti-malware programs to conduct regular scans automatically.

o  Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

o  Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

o  Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

o  Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

o  Consider disabling Remote Desktop protocol (RDP) if it is not being used.

o  Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

o  Execute operating system environments or specific programs in a virtualized environment.

o  Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[11]

66.    To prevent and detect cyber-attacks or ransomware attacks BCHP also could and

---

[11] Department of Justice, *How to Protect Your Networks from RANSOMWARE* at 3, https://www.justice.gov/criminal/criminal-ccips/file/872771/dl (last accessed June 25, 2024).

should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**
- Apply latest security updates;
- Use threat and vulnerability management;
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**
- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**
- Ensure collaboration among operations, security, and IT admins to configure servers and other endpoints securely;

**Build credential hygiene**
- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**
- Monitor for adversarial activities;
- Hunt for brute force attempts;
- Monitor for cleanup of Event Logs;
- Analyze logon events;

**Harden infrastructure**
- Use Windows Defender Firewall;
- Enable tamper protection; and
- Enable cloud-delivered protection.[12]

67.    The occurrence of the Data Breach indicates that BCHP failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of Plaintiff's and the Class Members' PII/PHI.

68.    BCHP failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-

---

[12] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), https://www.microsoft.com/en-us/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last accessed June 25, 2024).

3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

69.     Such frameworks are the existing and applicable industry standards. BCHP failed to comply with these accepted standards, thus opening the door to criminals and the Data Breach. Had BCHP implemented them properly, the Data Breach would not have occurred.

70.     Given that BCHP was storing the sensitive PII/PHI of its clients' current and former patients, BCHP could and should have implemented all of the above measures to prevent and detect cyberattacks.

### iv.    BCHP failed to comply with HIPAA.

71.     BCHP is a covered business associate under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

72.     BCHP is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[13] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

73.     HIPAA's Privacy Rule, or *Standards for Privacy of Individually Identifiable Health Information*, establishes national standards for the protection of health information.

74.     HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic*

---

[13] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

*Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

75.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

76.    "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

77.    HIPAA's Security Rule requires BCHP to do the following:

   a.    Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

   b.    Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

   c.    Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

   d.    Ensure compliance by its workforce.

78.    HIPAA also requires BCHP to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, BCHP is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

79.    HIPAA and HITECH also obligated BCHP to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not

permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

80.     Given that BCHP was storing the sensitive PII/PHI of its clients' current and former patients, BCHP could and should have implemented all of the above measures to prevent and detect cyberattacks. Its failure to implement one or more of the above is directly traceable to the Data Breach.

### G.     Plaintiff and the Class Members were harmed, and their injuries are traceable to BCHP's acts and omissions.

81.     Plaintiff and the Class Members would not have provided their PII/PHI to BCHP had they known BCHP would not keep it protected and confidential. Now, Plaintiff and the Class Members have suffered actual injuries and damages as a result of the Data Breach. Plaintiff and Class Members suffered actual injury from having their PII/PHI compromised in the Data Breach including (a) damage to and diminution in the value of their PII/PHI—a form of property that BCHP obtained from Plaintiff—as well as the value of their bargain with BCHP; (b) lost time and money protecting themselves; (c) violation of their privacy rights and emotional distress; and (d) present and continuing injury arising from the increased risk of additional identity theft and fraud.

82.     ***Damage to and diminution in value of PII/PHI and benefit of the bargain.*** Plaintiff and the Class Members have suffered actual injury in the form of damages and diminution in the value of their PII/PHI – a form of intangible property that they entrusted to BCHP. Plaintiff and the Class Members also suffered from diminution of the value of their bargain with BCHP, which included BCHP's promises to protect patients' PII/PHI consistent with state and federal law and BCHP's own Privacy Practices and Website Policy.

83.    PII can be sold at prices exceeding \$1,000.[14] A stolen credit or debit card number can sell for \$15 to \$110 on the Dark Web.[15] Criminals can also purchase access to entire company data breaches for an average cost of between \$2,000 to \$4,000.[16]

84.    Law-abiding consumers place a high value on the privacy of that data. Researchers shed light on how many consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[17]

85.    Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[18]

86.    Accordingly, any company that conducts business with a consumer and subsequently compromises the privacy of their PII effectively deprives that consumer of the full monetary value of their transaction with the company.

87.    When agreeing to obtain medical services from BCHP under certain terms, Plaintiff, the Class Members, and other reasonable patients understood and expected that BCHP would properly safeguard and protect their PII/PHI, when in fact, BCHP did not provide the

---

[14] Ryan Smith, *Revealed – How much is Personal information worth on the dark web?*, Insurance News (May 1, 2023), https://www.insurancebusinessmag.com/us/news/breaking-news/revealed--how-much-is-personal-information-worth-on-the-dark-web-444453.aspx.

[15] Miklos Zoltan, *Dark Web Price Index 2023*, Privacy Affairs (April 23, 2023), https://www.privacyaffairs.com/dark-web-price-index-2023/.

[16] Kaspersky, *Cybercriminals sell access to companies via the Dark Web from \$2000* (June 15, 2022), https://www.kaspersky.com/about/press-releases/2022_cybercriminals-sell-access-to-companies-via-the-dark-web-from-2000.

[17] Janice Y. Tsai et al., The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study, 22(2) Information Systems Research 254 (June 2011), accessible at https://www.jstor.org/stable/23015560?seq=1.

[18] *Medical I.D.Theft*, EFraudPrevention, https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%%20use%20your.credit%20report%20may%20be%20affected.

expected data security. Accordingly, Plaintiff and the Class Members received medical services of a lesser value than what they reasonably expected to receive under the bargains they struck with BCHP.

88.     ***Lost time and money spent on mitigation.*** Plaintiff and the Class Members suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach. Time is a compensable and valuable resource in the United States.

89.     According to the U.S. Bureau of Labor Statistics, 55.5% of U.S.-based workers are compensated on an hourly basis.[19]

90.     According to the U.S. Bureau of Labor Statistics' 2018 American Time Use Survey, American adults have only 36 to 40 hours of "leisure time" outside of work per week;[20] leisure time is defined as time not occupied with work or chores and is "the time equivalent of 'disposable income.'"[21] Usually, this time can be spent at the option and choice of the consumer, however, having been notified of the Data Breach, consumers now have to spend hours of their leisure time self-monitoring their accounts, communicating with financial institutions and government entities, and placing other prophylactic measures in place to attempt to protect themselves.

91.     Because of the Data Breach, Plaintiff and Class Members have spent—and will continue to spend—considerable time and money to try to mitigate and address harms caused by the Data Breach.

92.     When BCHP finally announced the Data Breach, it deliberately underplayed the

---

[19] *Characteristics of minimum wage workers, 2020*, U.S. Bureau of Labor Statistics (Feb. 2021), https://www.bls.gov/opub/reports/minimum-wage/2020/home.htm.
[20] Cory Stieg, *You're spending your free time wrong — here's what to do to be happier and more successful*, CNBC https://www.cnbc.com/2019/11/06/how-successful-people-spend-leisure-time-james-wallman.html (Nov. 6, 2019).
[21] *Id.*

Breach's severity and obfuscated the nature of the Breach. BCHP's notice fails to explain how the breach occurred (what security weakness was exploited), what exact data elements of each affected individual were compromised, who perpetrated the Data Breach, and the extent to which certain data elements were compromised. Had Plaintiff and the Class Members been notified of the Data Breach in a timely manner and with greater specificity, they could have better attempted to mitigate their injuries. But BCHP deprived them of that opportunity.

93.     ***Loss of privacy and emotional distress.*** Plaintiff and Class Members also suffered emotional distress because of the release of their PII/PHI—which they believed would be protected from unauthorized access and disclosure. Now, Plaintiff and Class Members suffer from anxiety about unauthorized parties viewing, selling, and/or using their PII/PHI for nefarious purposes like identity theft and fraud.

94.     ***Severe, imminent risk of identity theft.*** Plaintiff and the Class Members have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from theft of their PII/PHI. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes.

95.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts. According to experts, one out of four data breach notification recipients become a victim of identity fraud.[22]

---

[22] Anne Saita, *Study Shows One in Four Who Receive Data Breach Letter Become Fraud Victims*, Threat Post, (Feb. 20, 2013) https://threatpost.com/study-shows-one-four-who-receive-data-breach-letter-become-fraud-victims-022013/77549/.

96.     Moreover, "medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," according to Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[23]

97.     A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[24] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[25]

98.     It can take victims years to spot or identify PII/PHI theft, giving criminals plenty of time to milk that information for cash.

99.     One such example of criminals using PII/PHI for profit is the development of "Fullz" packages.[26]

---

[23] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, Kaiser Health News (Feb. 7, 2014) https://khn.org/news/rise-of-indentity-theft.

[24] *See* Elinor Mills, *Study: Medical Identity Theft is Costly for Victims*, CNET (Mar, 3, 2010), https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/.

[25] *Id.*; *see also Healthcare Data Breach: What to Know About them and What to Do After One,* Experian (Mar. 31, 2023), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

[26] "Fullz" is fraudster-speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record or more on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz", which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, "Medical Records For Sale in Underground Stolen From Texas Life Insurance Firm," Krebs on Security (Sep. 18, 2014) https://krebsonsecurity.com/tag/fullz/.

100.    Cyber-criminals can cross-reference two sources of personal information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

101.    The development of "Fullz" packages means that stolen PII/PHI from the Data Breach can easily be linked with other information such as phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information was not included in the PII/PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

102.    Plaintiff and the Class Members have a continuing interest in ensuring that their PII/PHI, which upon information and belief remains backed up and in BCHP's possession, is protected and safeguarded from future breaches. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII/PHI.

## CLASS ACTION ALLEGATIONS

103.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiff proposes the following Classes, subject to amendment as appropriate:

**All persons in the United States whose PII/PHI was compromised in the Data Breach.**

104.    Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the

judiciary to whom this case is assigned, their families and members of their staff.

105.     <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable.

106.     <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.     Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' PII/PHI;

b.     Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.     Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.     Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.     Whether Defendant owed a duty to Class Members to safeguard their PII/PHI;

f.     Whether Defendant breached its duty to Class Members to safeguard their PII/PHI;

g.     Whether computer hackers obtained Class Members' PII/PHI in the Data Breach;

h.     Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i.     Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.      Whether Defendant's conduct was negligent;

k.      Whether Defendant breached express and/or implied contracts for adequate data security with Plaintiff and Class Members;

l.      Whether Defendant was unjustly enriched by retention of the monetary benefits conferred on it by Plaintiff and Class Members;

m.      Whether Defendant failed to provide notice of the Data Breach in a timely manner; and

n.      Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

107.    <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII/PHI, like that of every other Class Member, was compromised in the Data Breach.

108.    <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the Class Members. Plaintiff's Counsel are competent and experienced in litigating class actions.

109.    <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and the Class Members, in that all the Plaintiff's and Class Members' PII/PHI was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

110.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is

superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

111.    BCHP has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

### COUNT I
### NEGLIGENCE
### (On behalf of Plaintiff and the Class)

112.    Plaintiff repeats and realleges each and every fact, matter, and allegation set forth in Paragraphs 1 through 111 and incorporates them at this point by reference as though set forth in full.

113.    BCHP owed a duty of care to Plaintiff and the Class Members to use reasonable means to secure and safeguard the entrusted PII/PHI, to prevent its unauthorized access and disclosure, to guard it from theft, and to detect any attempted or actual breach of its systems, as alleged herein. These common law duties existed because Plaintiff and the Class Members were the foreseeable and probable victims of any inadequate security practices in BCHP's affirmative development and maintenance of its data security systems and its hiring of third-party providers entrusted with accessing, storing, safeguarding, handling, collecting, and/or protecting Plaintiff's

and the Class Members' PII/PHI. In fact, not only was it foreseeable that Plaintiff and the Class Members would be harmed by the failure to protect their PII/PHI because hackers routinely attempt to steal such information and use it for nefarious purposes, BCHP also knew that it was more likely than not that Plaintiff's and other Class Members would be harmed by such exposure and theft of their PII/PHI.

114.    BCHP's duties to use reasonable security measures also arose from a special relationship with Plaintiff and the Class Members as a result of being entrusted with their PII/PHI, which provided an independent duty of care. Plaintiff's and the Class Members' PII/PHI was entrusted to BCHP based on the understanding that BCHP would take adequate security precautions. Moreover, BCHP was capable of protecting its network and systems, and the PII/PHI it stored on them, from unauthorized access, but failed to do so.

115.    BCHP breached its duties when it failed to use security practices that would protect the PII/PHI provided to it by Plaintiff and the Class Members, thus resulting in unauthorized exposure and access to their PII/PHI.

116.    BCHP further breached its duties by failing to design, adopt, implement, control, manage, monitor, update, and audit its processes, controls, policies, procedures, and protocols to comply with the applicable laws and safeguard and protect Plaintiff's and the Class Members' PII/PHI within its possession, custody, and control.

117.    As a direct and proximate cause of BCHP's failure to use appropriate security practices and failure to select a third-party provider with adequate data security measures, Plaintiff's and the Class Members' PII/PHI was exposed, disseminated, and made available to unauthorized third parties.

118.    BCHP admitted that Plaintiff's and the Class Members' PII/PHI was wrongfully

disclosed as a result of the Data Breach.

119.    Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. BCHP knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the critical importance of providing adequate security of that PII/PHI, and the necessity for encrypting PII/PHI stored on its systems.

120.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII/PHI would result in one or more types of injuries to Class Members.

121.    But for BCHP's wrongful and negligent breach of its duties owed to Plaintiff and the Class Members, their PII/PHI would not have been compromised.

122.    Neither Plaintiff nor Class members contributed to the Data Breach or subsequent misuse of their PII/PHI as described in this Complaint.

123.    The Data Breach caused direct and substantial damages to Plaintiff and the Class Members, as well as the likelihood of future and imminent harm through the dissemination of their PII/PHI and the greatly enhanced and imminent risk of identity theft.

124.    As a direct and proximate result of BCHP's negligence, Plaintiff and the Class Members have been injured and are entitled to damages in an amount to be proven at trial. Their injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss; loss of the value of their privacy and the confidentiality of the stolen PII/PHI; illegal sale of the compromised PII/PHI on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach investigating the nature

of the Data Breach not fully disclosed by BCHP, reviewing bank statements, payment card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII/PHI; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On behalf of Plaintiff and the Class)**

125.    Plaintiff repeats and realleges each and every fact, matter, and allegation set forth in Paragraphs 1 through 111 and incorporates them at this point by reference as though set forth in full.

126.    BCHP owed a duty of care to Plaintiff and the Class Members to use reasonable means to secure and safeguard the entrusted PII/PHI, to prevent its unauthorized access and disclosure, to guard it from theft, and to detect any attempted or actual breach of its systems, as alleged herein. These duties arose under the FTC Act and HIPAA.

127.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by BCHP of failing to use reasonable measures to protect PII/PHI.

128.    BCHP violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect PII/PHI and not complying with industry standards. BCHP conduct was particularly unreasonable given the nature and amount of PII/PHI obtained and stored and the foreseeable consequences of a data breach.

129.    Plaintiff and the Class Members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) were intended to protect.

130.    Moreover, the harm that has occurred is the type of harm the FTC Act (and similar

state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which caused the same harm suffered by Plaintiff and the Class Members.

131.    BCHP's duty to use reasonable security measures under HIPAA required BCHP's to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

132.    BCHP's violation of Section 5 of the FTC Act (and similar state statutes) and HIPAA constitutes negligence *per se*.

133.    Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. BCHP knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the critical importance of providing adequate security of that PII/PHI, and the necessity for encrypting PII/PHI stored on its systems.

134.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII/PHI would result in one or more types of injuries to Class Members.

135.    But for BCHP's wrongful and negligent breach of its duties owed to Plaintiff and the Class Members, their PII/PHI would not have been compromised.

136.    Neither Plaintiff nor Class members contributed to the Data Breach or subsequent misuse of their PII/PHI as described in this Complaint.

137.    The Data Breach caused direct and substantial damages to Plaintiff and the Class

Members, as well as the likelihood of future and imminent harm through the dissemination of their PII/PHI and the greatly enhanced and imminent risk of identity theft.

138.    As a direct and proximate result of BCHP's negligence, Plaintiff and the Class Members have been injured and are entitled to damages in an amount to be proven at trial. Their injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss; loss of the value of their privacy and the confidentiality of the stolen PII/PHI; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach investigating the nature of the Data Breach not fully disclosed by BCHP, reviewing bank statements, payment card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII/PHI; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

## COUNT III
## BREACH OF CONTRACT
### (On Behalf of Plaintiff and the Class)

139.    Plaintiff repeats and realleges each and every fact, matter, and allegation set forth in Paragraphs 1 through 111 and incorporates them at this point by reference as though set forth in full.

140.    Plaintiff and the Class Members entered into contracts with BCHP when they obtained services from BCHP, or otherwise provided PII/PHI to BCHP.

141.    As part of these transactions, BCHP agreed to safeguard and protect the PII/PHI of Plaintiff and the Class Members.

142.    BCHP expressly promised to Plaintiff and the Class Members that:

a.    "We are required by law to maintain the confidentiality of health information that identifies our patients . . . ."

b.    "Our practice will obtain your written authorization for uses and disclosures that are not identified by this notice or permitted by applicable law."

143.    BCHP also promises that it will only share patients' PII/PHI in specific scenarios that are identified in the Privacy Practices, which are largely limited to uses related to the hospital's operations and patient care.

144.    These promises to Plaintiff and the Class Members formed the basis of the bargain between Plaintiff and the Class Members, on the one hand, and BCHP, on the other.

145.    Plaintiff and the Class Members would not have provided their PII/PHI to BCHP had they known that BCHP would not safeguard their PII/PHI.

146.    Plaintiff and the Class Members fully performed their obligations under their contracts with BCHP. But BCHP breached its contracts with Plaintiff and the Class Members by failing to safeguard Plaintiff's and the Class Members' PII/PHI.

147.    As a direct and proximate result of BCHP breach of contract, Plaintiff and the Class Members have been injured and are entitled to damages in an amount to be proven at trial. Their injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII/PHI; illegal sale of the compromised PII/PHI on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit

scores and ratings; lost work time; lost value of the PII/PHI; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

**COUNT IV**
***IN THE ALTERNATIVE*—BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

148.    Plaintiff repeats and realleges each and every fact, matter, and allegation set forth in Paragraphs 1 through 111 and incorporates them at this point by reference as though set forth in full.

149.    Plaintiff allege Count IV in the alternative to Count III.

150.    Plaintiff and the Class Members entered into an implied contract with BCHP when they obtained services from BCHP, or otherwise provided PII/PHI to BCHP.

151.    As part of these transactions, BCHP agreed to safeguard and protect the PII/PHI of Plaintiff and the Class Members.

152.    Plaintiff and the Class Members entered into the implied contracts with the reasonable expectation that BCHP's data security practices and policies were reasonable and consistent with legal requirements and industry standards.

153.    Plaintiff and the Class Members would not have provided and entrusted their PII/PHI to BCHP in the absence of the implied contract or implied terms between them and BCHP. The safeguarding of the PII/PHI of Plaintiff and the Class Members was part of the basis of the parties' bargain.

154.    Plaintiff and the Class Members fully performed their obligations under the

implied contracts with BCHP.

155.    BCHP breached its implied contracts with Plaintiff and the Class Members to protect their PII/PHI when they (1) failed to take reasonable steps to use safe and secure systems to protect that information; and (2) allowed the theft of that information by unauthorized third parties.

156.    As a direct and proximate result of BCHP breach of implied contract, Plaintiff and the Class Members have been injured and are entitled to damages in an amount to be proven at trial. Their injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII/PHI; illegal sale of the compromised PII/PHI on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII/PHI; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

## COUNT V
### *IN THE ALTERNATIVE*—UNJUST ENRICHMENT
### (On behalf of Plaintiff and the Class)

157.    Plaintiff repeats and realleges each and every fact, matter, and allegation set forth

in Paragraphs 1 through 111 and incorporates them at this point by reference as though set forth in full.

158.    Plaintiff alleges Count V in the alternative to Count III above.

159.    Plaintiff and the Class Members have an interest, both equitable and legal, in the PII they provided BCHP and that was ultimately stolen in the Data Breach.

160.    BCHP benefitted from receiving Plaintiff's and the Class Members' PII/PHI, and by its ability to retain, use, sell, and profit from that information. BCHP accepted and was aware of the benefits conferred upon it by Plaintiff and the Class Members.

161.    BCHP also understood and appreciated that the PII/PHI pertaining to Plaintiff and the Class Members was private and confidential and its value depended upon BCHP maintaining the privacy and confidentiality of that PII/PHI except as expressly agreed.

162.    But for BCHP's willingness and commitment to maintain its privacy and confidentiality, Plaintiff and the Class Members would not have provided PII/PHI to BCHP or would not have permitted BCHP to gather additional PII/PHI.

163.    Plaintiff's and the Class Members' PII/PHI has an independent value to BCHP. BCHP was unjustly enriched by profiting from the additional services and products it was able to market, sell, and create through the use of Plaintiff's and the Class Members' PII/PHI.

164.    Due to BCHP's actions, BCHP also unjustly obtained benefits equivalent to the disparity in value between the payments made for services with reasonable data privacy and security measures, and the services received, which lacked such measures.

165.    BCHP also unjustly obtained benefits equal to the value of Plaintiff's and the Class Members' PII/PHI.

166.    It is inequitable, unfair, and unjust for BCHP to retain these wrongfully obtained

benefits. BCHP's retention of wrongfully obtained monies would violate fundamental principles of justice, equity, and good conscience.

167.    The benefit conferred upon, received, and enjoyed by BCHP was not conferred officiously or gratuitously, and it would be inequitable, unfair, and unjust for BCHP to retain the benefit.

168.    BCHP defective security and its unfair and deceptive conduct have, among other things, caused Plaintiff and the Class Members to unfairly incur substantial time and/or costs to mitigate and monitor the use of their PII/PHI and has caused the Plaintiff and the Class Members other damages as described herein.

169.    Plaintiff and the Class Members have no adequate remedy at law.

170.    BCHP is therefore liable to Plaintiff and the Class Members for restitution or disgorgement in the amount of the benefit conferred on BCHP as a result of its wrongful conduct, including specifically: the value to BCHP of the PII that was stolen in the Data Breach; the profits BCHP received and is receiving from the use of that information; and the amounts that BCHP overcharged Plaintiff and the Class Members for use of BCHP's products and services.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class pray for judgment against BCHP as follows:

A.    An order certifying this action as a class action under Federal Rule of Civil Procedure 23, appointing the undersigned as Class Counsel, and finding that Plaintiff is a proper representative of the proposed Class;

B.    For injunctive and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C.    For an award of compensatory, consequential, and general damages, including

nominal damages, as allowed by law in an amount to be determined;

      D.     For an award of restitution or disgorgement, in an amount to be determined;

      E.     For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

      F.     For prejudgment interest on all amounts awarded; and

      G.     Such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all triable issues.

DATED:  October 25, 2024          Respectfully submitted,

                    */s/ Katherine M. Aizpuru*
                    Katherine M. Aizpuru (No. 5305990)
                    David W. Lawler (*pro hac vice forthcoming*)
                    David McGee (*pro hac vice forthcoming*)
                    **TYCKO & ZAVAREEI LLP**
                    2000 Pennsylvania Avenue, NW, Suite 1010
                    Washington, D.C. 20006
                    Phone: (202) 973-0900
                    kaizpuru@tzlegal.com
                    dlawler@tzlegal.com
                    dmcgee@tzlegal.com

                    *Counsel for Plaintiffs and the Proposed Class*